No. 16-35528

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
    Plaintiff - Appellant,

v.

GLOBAL HORIZONS, INC., DBA Global Horizons Manpower, Inc.;
GREEN ACRE FARMS, INC.;
VALLEY FRUIT ORCHARDS, LLC;
DOES, 1-10 Inclusive,
    Defendants - Appellees.

---

On Appeal from the United States District Court for the
Eastern District of Washington (No. 2:11-cv-03045-EFS)

---

REPLY BRIEF OF THE EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION AS APPELLANT

---

JAMES L. LEE
Deputy General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

LORRAINE C. DAVIS
Assistant General Counsel

ELIZABETH E. THERAN
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4720
elizabeth.theran@eeoc.gov

TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................iii

INTRODUCTION ...............................................................................1

ARGUMENT......................................................................................2

I.    The First Amended Complaint ("FAC") Adequately Alleges that the
      Growers, As Joint Employers of the Claimants, Were Liable for Both
      Orchard- and Non-Orchard-Related Violations of Title VII....................2

   A. A Complaint is Viable When, Taken As a Whole, It Provides Sufficient
      Factual Matter to State a Plausible Claim to Relief....................2

   B. The FAC Adequately Pleads that the Growers Were the Claimants'
      Joint Employers. ...............................................................4

      1. The governing legal standard is the "economic reality" test in
         *Pacific Maritime* and *Torres-Lopez*. ..........................................4

      2. EEOC adequately pled that the Growers were the Claimants' joint
         employers in all respects..........................................................8

   C. The FAC Adequately Pleads that the Growers Knew or Should Have
      Known About Global's Non-Orchard-Related Discriminatory Actions
      but Failed to Take Corrective Action Within Their Control.................15

   D. The FAC Adequately Pleads the Claimants Were Subjected to
      Orchard-Related Disparate Treatment on the Basis of Their National
      Origin and that the Growers Were Liable For It. ...................................17

   E. The Denial of Discovery Regarding Non-Orchard-Related Matters
      Was an Abuse of Discretion that Prejudiced EEOC. ..............................21

II.  EEOC Adduced Sufficient Evidence that the Growers Were Liable for the Orchard-Based Hostile Work Environments to Survive Summary Judgment. ..................................................................................22

    A.  When EEOC Alleges a Pattern or Practice of Discrimination, It Is Only Required to Adduce Evidence of the Pattern or Practice. ....................22

    B.  There Was Sufficient Evidence to Support EEOC's Individual Claims. .............................................................................................24

        1. EEOC Was Not Required to Provide a Declaration for Each Claimant. ..............................................................................25

        2. The Declarations Are Not "Shams." ....................................................26

        3. A reasonable jury could find the Growers, as joint employers, were liable for the hostile work environment in the orchards. ................30

III.  The District Court Abused Its Discretion In Awarding the Growers Their Attorney's Fees. ....................................................................35

    A.  Substantive Judicial Review of EEOC's Investigation Is Both Impermissible and Unhelpful. ..................................................................35

    B.  This Action Is Not Frivolous, Unreasonable, or Without Foundation. ..................................................................................37

CONCLUSION ..................................................................................39

CERTIFICATE OF COMPLIANCE ................................................................40

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Pac. Maritime Ass'n*, 336 F.3d 924 (9th Cir. 2003) .......................7, 9

*Antenor v. D & S Farms*, 88 F.3d 925 (11th Cir. 1996)......................................5, 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................2, 3, 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)......................................2, 3, 8

*Brown v. Daikin Am. Inc.*, 756 F.3d 219 (2d Cir. 2014)......................................19

*Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003) ........................................24

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) ..........................35, 37

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*,
   225 F.3d 1115 (9th Cir. 2000)..............................................................................26

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999) ...........................26, 28

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014)..................................................................................3

*EEOC v. Am. Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981) ..................................23

*EEOC v. Bass Pro Outdoor World, LLC*, 826 F.3d 791 (5th Cir. 2016),
   *reh'g en banc denied*, 2017 WL 1540853 (Apr. 28, 2017).................................23

*EEOC v. Bruno's Rest.*, 13 F.3d 285 (9th Cir. 1993) ...........................................36

*EEOC v. Gen. Tel. Co. of NW., Inc.*, 885 F.2d 575 (9th Cir. 1989)....................23

*EEOC v. NEA-Alaska*, 422 F.3d 840 (9th Cir. 2004) ..........................................34

*EEOC v. Pac. Maritime Ass'n*, 351 F.3d 1270 (9th Cir. 2003).........................4, 7

*EEOC v. Sterling Jewelers*, 801 F.3d 96 (2d Cir. 2015) .........................................36

*EEOC v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005
(D. Ariz. 2013) ........................................................................22, 23

*Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006)................................15

*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151 (9th Cir. 2010) ............................19

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .......................23, 24

*Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999) ................................23

*Kohler v. Bed Bath & Beyond of Cal.*, 780 F.3d 1260 (9th Cir. 2015).............35, 38

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...................................31

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007)..................................34

*Murray v. Principal Fin. Grp.*, 613 F.3d 943 (9th Cir. 2010)................................8

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ...........................7, 8, 38

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ...........................35

*Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403 (7th Cir. 2007)......6, 9, 10, 14

*Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012) .........................................23

*Sheppard v. David Evans & Assocs.*, 694 F.3d 1045 (9th Cir. 2012) ...............2, 17

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011)...........................................................3

*Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 2001) .................................................15

*Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997) ..................................4, 5, 6, 37

*Van Asdale v. Int'l Game Tech.*, 577 F.3d 989 (9th Cir. 2009) .................27, 28, 29

iv

## STATUTES & REGULATIONS

Title VII of the Civil Rights Act of 1964,
42 U.S.C. §§ 2000e *et seq.*................................................................*passim*

   Section 706, 42 U.S.C. § 2000e-5 ............................................22, 23

20 C.F.R. § 655.102(b)(6)(i)-(ii) ............................................................20

## RULES

Ninth Cir. R. 32-1(b)................................................................................40

Ninth Cir. R. 32-1(c) ...............................................................................40

Fed. R. App. P. 32(a) ...............................................................................40

Fed. R. App. P. 32(f) ...............................................................................40

Fed. R. Civ. P. 8...........................................................................2, 8, 37

Fed. R. Civ. P. 12.....................................................................................37

Fed. R. Civ. P. 50.....................................................................................37

Fed. R. Civ. P. 56.....................................................................................37

Fed. R. Evid. 603 .....................................................................................28

Fed. R. Evid. 801(d)(2)(A) ......................................................................30

## OTHER AUTHORITIES

*Testimony*, BLACK'S LAW DICTIONARY (10th ed. 2014).......................................28

## INTRODUCTION

EEOC brought this lawsuit to vindicate the Title VII rights of a vulnerable group of Thai agricultural guest workers (the "Claimants"). As the district court ultimately found, defendant Global Horizons brought the Claimants to the United States under false pretenses, targeting them because it believed they would be less likely to complain about mistreatment than workers of other nationalities. I-ER-4-5. Defendants Green Acre Farms and Valley Fruit Orchards (the "Growers") entered into H-2A agreements with Global for the 2004 and 2005 growing seasons and profited off the Claimants' labor (and mistreatment), notwithstanding the readily available information about Global's ongoing misconduct and the hostile working conditions in their own orchards.

In their response brief ("Growers-Br."), the Growers attempt to distract this Court from the errors in the district court's analyses below. They repeatedly proffer incorrect legal standards and cherry-pick evidence favorable to their views while ignoring the rest. EEOC submits this reply brief to clarify the factual record and the governing law.

<u>ARGUMENT</u>

I.  **The First Amended Complaint ("FAC") Adequately Alleges that the Growers, As Joint Employers of the Claimants, Were Liable for Both Orchard- and Non-Orchard-Related Violations of Title VII.**

A.  A Complaint is Viable When, Taken As a Whole, It Provides Sufficient Factual Matter to State a Plausible Claim to Relief.

If a complaint provides "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," with allegations that "raise a right to relief above the speculative level," it must survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see* Opening Brief of EEOC ("EEOC-Br.") 54-55. This standard "does not require that a complaint contain 'detailed factual allegations.' As the text of Rule 8(a)(2) itself makes clear, even a 'short and plain' statement can state a claim for relief." *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1048-49 (9th Cir. 2012) (internal citations omitted). The complaint is properly assessed as a whole, not by a piecemeal analysis of its component parts. *E.g.*, *Twombly*, 550 U.S. at 569 n.14 (complaint warranted dismissal

2

"because it failed *in toto* to render plaintiffs' entitlement to relief plausible").

This Court has addressed the proper application of *Iqbal* and *Twombly* on multiple occasions. *See, e.g.*, *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995-97 (9th Cir. 2014); *Starr v. Baca*, 652 F.3d 1202, 1214-16 (9th Cir. 2011). It has distilled the following principles: first, "to be entitled to the presumption of truth, allegations in a complaint … may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"; and, second, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief…." *Eclectic Props.*, 751 F.3d at 996. Thus, "'Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*.'" *Id.* (quoting *Starr*, 652 F.3d at 1216).

B.   The FAC Adequately Pleads that the Growers Were the Claimants'
      Joint Employers.

1.   The governing legal standard is the "economic reality" test in
      *Pacific Maritime* and *Torres-Lopez*.

Joint employer status turns on whether two entities share control

over a worker's terms and conditions of employment.  *See* EEOC-Br.50.  In

considering this question under Title VII in *Pacific Maritime*, this Court

pointed to *Torres-Lopez v. May*, 111 F.3d 633, 646 (9th Cir. 1997), an FLSA

and AWPA case where it "had to decide whether a grower and a labor

contractor were joint employers of migrant farm workers," as an

appropriate application of the "economic reality" test for joint

employment.  *EEOC v. Pac. Maritime Ass'n*, 351 F.3d 1270, 1275 (9th Cir.

2003).

As explained previously (EEOC-Br.51-52), although the district court

claimed to follow *Pacific Maritime* and *Torres-Lopez*, it actually did not.

Instead, it deferred heavily to the "employer" and "client" labels in the H-

2A agreements and a purported lack of allegations in the FAC about the

4

Growers' practices or general "practice[s] in the orchard industry." I-ER-164-65.

In *Torres-Lopez*, this Court took note of the "fundamental principle behind the joint employment doctrine: that a worker may be employed by more than one entity at the same time." 111 F.3d at 641. "The issue is not whether a farmworker is *more* dependent upon the farm labor contractor or the grower. Rather, the inquiry must focus on the economic reality of the particular relationship between the farmworker and the alleged joint employer." *Id.* In making that assessment, the *Torres-Lopez* Court considered thirteen factors describing the relationships between growers, labor contractors, and agricultural workers. *Id.* at 639-40. As the Eleventh Circuit explained, these factors are "tools … to gauge the degree of dependence of alleged employees on the business to which they are connected," because "dependence … indicates employee status." *Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996) (internal citation omitted).

*Torres-Lopez*, *Antenor*, and similar cases make this clear: when agricultural workers are sufficiently economically dependent on a grower

due to, inter alia, the grower's ownership and control of the farmland, equipment and facilities, and working conditions, the grower is considered their joint employer. *See, e.g., Torres-Lopez*, 111 F.3d at 640-42 (ruling that farm was joint employer of cucumber pickers where it controlled overall harvest schedule and number of workers needed, advised labor broker about when to begin harvest, and farm owner retained right to inspect all work performed by laborers, which he did daily); *id.* at 643-44 (addressing remaining factors); *Antenor*, 88 F.3d at 933-38 (finding that growers were joint employers of seasonal pickers where growers owned land, provided "virtually all the equipment and facilities," determined, inter alia, how many seasonal workers to bring each day and when and where to assign workers, "oversaw and intervened in the pickers' work, both directly and indirectly, on a daily basis," and dictated hours and, during one season, "sen[t] their own tomato-picking crews into fields assigned to the farmworkers, causing them to run out of work by noon"); *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408 (7th Cir. 2007) (grower was joint employer of agricultural workers where crew performed "a specialty

6

job in an agricultural operation," broker "put together a crew for
Remington alone," workers "took instruction from [the broker] but
followed work rules that Remington laid down," and "Remington supplied
the tools (and the outhouses)" and "posted supervisors in the fields to
inspect the work and tell the crew when the job had to be re-done").

On appeal, the Growers make two separate errors regarding the legal
standards governing joint employment. First, they fail to understand the
difference between joint employment and the *Sibley Hospital* third-party
interference theory of Title VII liability, which has never been advanced in
this case. *See* Growers-Br.21, 22, 27, 33 (citing *Anderson v. Pac. Maritime
Ass'n*, 336 F.3d 924 (9th Cir. 2003) (third-party interference case)); *compare*,
*e.g.*, *EEOC v. Pac. Maritime*, 351 F.3d at 1274 (third-party interference), 1275
(joint employer).

Second, even as they confuse joint employment with third-party
interference, the Growers ask this Court to apply a joint employer test
based on yet another inapposite legal question: the distinction between an
employee and an independent contractor, the issue in *Nationwide Mutual*

7

*Insurance Co. v. Darden*, 503 U.S. 318 (1992). Growers-Br.25; *see also* I-ER-99.

Both cases the Growers cite address this question as to individual

insurance agents; neither is a joint employer case. *Darden*, 503 U.S. at 323-

24; *Murray v. Principal Fin. Grp.*, 613 F.3d 943, 944-45 (9th Cir. 2010). As

explained above and in our opening brief (EEOC-Br.50-52, 63 n.6), *Darden*

is not the law of this Circuit—or anywhere—as to joint employment.

> 2. EEOC adequately pled that the Growers were the Claimants' joint employers in all respects.

The FAC adequately pleads a joint employer relationship between

the Growers and the Claimants for purposes of Rule 8(a), *Iqbal*, and

*Twombly*. The Growers insist that they cannot be joint employers of the

Claimants as to "non-orchard-related" matters, which were all supposedly

Global's responsibility. Growers-Br.26-27. But the fact that the Growers

"insourced" these aspects of their working relationship with the Claimants

to Global does not absolve them of legal responsibility.

The H-2A agreements expressly contemplated that Global could

provide transportation and/or housing for the Claimants in exchange for

additional payments from the Growers, and the Growers exercised these

options. EEOC-Br.9; VI-ER-1290, 1294, 1298, 1306. Thus, pay, housing, and transportation were all an anticipated and contracted-for part of the joint venture between the Growers and Global, as well as terms and conditions of the Claimants' employment.

That the Growers paid Global to handle these matters does not change the "economic reality" that the Claimants, as impoverished guest workers, were utterly dependent on the Growers for their pay, housing, and transportation. The district court cited no authority in support of its contrary ruling (I-ER-164-65), and the Growers muster only a cryptic, irrelevant "*cf.*" to *Anderson*, a third-party interference case. *See supra* at 7.

The Seventh Circuit addressed this issue in *Reyes*, a case bearing many factual similarities (and a few critical differences) to this one. In *Reyes*, the grower, Remington, hired a labor broker, Zarate, to provide workers for its fields. 495 F.3d at 404. Under his agreement with Remington, Zarate was to engage and pay the workers (*id.* at 405), but he promised Remington that he would *not* provide them with housing (*id.* at 410). Nonetheless, Zarate furnished his recruits with "dilapidated and

9

overcrowded" housing, and also failed to pay them for all the hours they worked. *Id.* at 405. After Zarate became insolvent, the workers sued Remington as their joint employer. *Id.*

The Seventh Circuit, applying the test described *supra* at 5-7, held that Remington was the workers' joint employer for all purposes except one: housing. *Id.* at 408-09. According to the court, "Remington must be deemed the workers' employer for events that occurred in the fields under its management or in its offices," including Zarate's failure to pay them, which, it explained, "arise[s] from events on the premises." *Id.* at 409-10.

But, the court held, Remington could not be liable for violations involving the workers' housing, given that Remington provided no housing itself and "obtained from Zarate a promise that he would not provide housing either." *Id.* at 410. Additionally, the court observed, there was no basis to conclude that Remington knew or should have known either about the state of the housing or that Zarate was responsible for it, because none of the workers claimed to have told Remington about it. *Id.*

Viewed in light of the analysis in *Reyes*, *Torres-Lopez*, and *Antenor*, the allegations in the FAC as a whole sufficiently plead that the Growers were the Claimants' joint employers as to both orchard- and non-orchard-related matters. For the Court's convenience, the FAC's relevant allegations are summarized in the following chart:

### Chart A: FAC Allegations of Joint Employment[1]

|   | FAC ¶¶ | Summary of Contents | XII-ER-# |
|---|---|---|---|
| 1 | 9-14 17-22 | Governing joint employer legal standards | 2912-13 2913-14 |
| 2 | 85, 89 | Claimants were vulnerable and dependent because Global confiscated their passports and visas and threatened to banish them back to Thailand if they complained. | 2923-24 |
| 3 | 120-28 172-86 | Growers retained control over orchard-related matters. | 2936-37 2947-49 |
| 4 | 106-09 | Growers' awareness of H-2A program requirements, including housing, based on compliance checklist from Global | 2929-33 |
| 5 | 112-13 | Global was cited for 2004 housing violations re: Thai workers "in or about May and June 2005."[2] | 2934 |
| 6 | 115-17 | Growers knew/should have known Global was supplying H-2A workers without a license in 2004. | 2935 |

[1] As discussed further below, rows 4-10 (light gray) also pertain to the Growers' liability for non-orchard-related conduct; rows 11-14 (medium gray) to orchard-related disparate treatment; and rows 15-20 (dark gray) to both issues.

[2] These citations well predate 2006. *See* Growers-Br.28-29.

| 7 | 133-34 | Green Acre knew/should have known that Global was operating without a license and/or was under investigation as early as July 2004, which should have prompted Green Acre to investigate substandard housing and/or living conditions at eight locations on the Claimants' clearance orders. | 2938-39 |
|---|--------|--------|--------|
| 8 | 136-40 | Factual allegations of housing and food deficiencies, including four specific addresses, plus unsafe transportation. Allegations that non-Thai workers, including Mexican workers, were not subjected to these conditions. | 2939-40 |
| 9 | 191-92 | Valley Fruit knew/should have known that Global was operating without a license and/or was under investigation in summer 2004, which should have prompted Valley Fruit to investigate substandard housing and/or living conditions at eight locations listed on the Claimants' clearance orders.[3] | 2949-50 |
| 10 | 194-203 | Factual allegations of housing and food deficiencies plus unsafe transportation re: Valley Fruit. Allegations that non-Thai workers, including Mexican workers, were not subjected to these conditions. | 2951-52 |
| 11 | 147-51 | Specific examples of disparate treatment in the Green Acre orchards between non-Thai workers and Claimants: time between breaks, priority and difficulty re: work assignments, freedom to leave farm, working in the rain | 2942 |

---

[3] The Growers' complaint that these are mere "conclusory allegations" (Growers-Br.28) rings particularly hollow given that, as learned in discovery, Valley Fruit owned and maintained one location, and one witness testified that a Valley Fruit employee lived on the premises with the Claimants. EEOC-Br.13-14; VII-ER-1676-77.

| 12 | 163 | Global supervisors harassed and/or threatened the Claimants to meet quotas set by Green Acre. | 2944 |
| 13 | 213-20 | Specific examples of disparate treatment in the Valley Fruit orchards: difficulty of work assignments, freedom to leave the farm, working in extreme heat, meeting quotas | 2954 |
| 14 | 229 | Global supervisors harassed and/or threatened the Claimants to meet quotas set by Valley Fruit. | 2956 |
| 15 | 132 168 | Some Claimants complained directly to Green Acre's personnel, including Jim Morford, about working conditions at Green Acre, including less favorable treatment vis-à-vis Mexican workers, harsh working conditions, and lack of work, which should have prompted an investigation.[4] | 2938 2945 |
| 16 | 141-46 | Claimants were subjected to improper deductions, denial/delay of payments, and long periods of no work at Green Acre, while non-Thai workers were not. | 2941-42 |
| 17 | 152-54 | Restrictions on Claimants' movements and communication with outsiders at Green Acre, which did not apply to non-Thai workers | 2942-43 |
| 18 | 189-90 | Valley Fruit directly engaged in or knew/should have known about the Claimants' working conditions because some of the Claimants complained directly to Valley Fruit personnel. Valley Fruit had an opportunity to intervene but failed to do so. | 2949 |

---

[4] The Growers complain (Growers-Br.28) that these allegations are insufficiently specific, apparently because individual complainants were not identified. But the law does not require such specificity. The Growers offer no explanation of how naming specific complainants would have affected either their notice of the complaints or their ability to defend themselves effectively at this early stage. *See supra* at 3.

| 19 | 204-12 | Claimants were subjected to improper deductions, denial and/or delay of payments, and long periods of no work at Valley Fruit, while non-Thai workers were not. | 2952-54 |
|----|--------|---|---|
| 20 | 221-27 | Restrictions on Claimants' movements and communication with outsiders at Valley Fruit, which did not apply to non-Thai workers | 2955-56 |

As the *Reyes* court observed, "treating a firm such as Remington as a joint employer will not increase its costs.… Only when it hires a fly-by-night operator … is Remington exposed to the risk of liability on top of the amount it has agreed to pay the contractor." 495 F.3d at 409. The same is true here. As alleged in the FAC, both Growers chose, repeatedly, to partner with Global, an entity with a public track record of compliance violations and mistreatment of vulnerable workers. Their joint ventures expressly contemplated both orchard- and non-orchard-related components, including housing, pay, and transportation. If the Growers' bargains with Global turned out to be bad ones, the Claimants should not be the ones to suffer the consequences.

14

C. The FAC Adequately Pleads that the Growers Knew or Should Have Known About Global's Non-Orchard-Related Discriminatory Actions but Failed to Take Corrective Action Within Their Control.

A joint employer may be liable for discrimination by another entity of which it knew or should have known and failed to take corrective action within its control. *See* EEOC-Br.53. Although the Growers advanced this standard below, they now argue (based on *the same* legal precedent) that its "should have known" component contravenes this Court's law. Growers-Br.29; I-SER-30 (citing *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006); *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001)). They are wrong. *See Freitag*, 468 F.3d at 538 (not joint employer; addressing employer liability for harassment *by non-employees*); *Swenson*, 271 F.3d at 1191 (not joint employer; addressing employer liability for coworker harassment).

As to the non-orchard-related hostile work environment, the FAC's relevant allegations are summarized in Chart A *supra* at lines 4-10 and 15-20 (highlighted in light and dark gray). *See also* EEOC-Br.53-54.

In its later summary judgment order, the district court found Valley Fruit's ownership of the Royal Valley house inconsequential because there

was no evidence the Claimants believed their living conditions "were provided because of their race or national origin." I-ER-112-13. Nor did it matter that the "Grower Defendants knew and should have known that the State of Washington had cited Global for violating state regulations," because there was no evidence those citations "were based on the Thai Claimants' race or national origin." I-ER-113-14. But neither the Claimants' beliefs nor the statutory bases for the Growers' citations were relevant to the Growers' potential liability.

EEOC's theory of Title VII liability here was that Global targeted Thai workers for mistreatment based on its belief that they would be more compliant than those of other nationalities. As joint employers, therefore, the Growers would be liable for that mistreatment insofar as they knew or should have known about it but failed to take corrective action within their control. *See supra* at 15.

The Claimants' *perception* of why their housing was so poor is not an element of any of these claims. Evidence that Valley Fruit owned, maintained, and had an employee living in the Royal City house was

16

evidence that Valley Fruit *knew*—not just should have known—about that substandard housing. And whether Global was cited for violating antidiscrimination law is also irrelevant; rather, the point is that Global's contemporaneous citations for egregious wage, safety, and health violations should have prompted the Growers to investigate those situations, which would have revealed Global's discriminatory conduct. XII-ER-2938, 2950.

> D. The FAC Adequately Pleads the Claimants Were Subjected to Orchard-Related Disparate Treatment on the Basis of Their National Origin and that the Growers Were Liable For It.

The FAC contains numerous specific allegations regarding the Claimants' different treatment from non-Thai workers with respect to orchard-related matters. EEOC-Br.56-57; *see* Chart A *supra* at lines 11-20 (highlighted in medium and dark gray).[5]

---

[5] The Growers complain that the allegations summarized at lines 11 and 18 of Chart A are "vague," "generic," and "unattributed to any defendant." Growers-Br.23. In fact, the allegations are quite specific and broken down by defendant, with those at FAC par. 147-51 pertaining to Green Acre, and 213-20 to Valley Fruit. Insofar as the Growers demand even more detail, none is required. *See Sheppard*, 694 F.3d at 1048-49.

The Growers offer two principal responses. First, they reiterate that these allegations are "yelling and intolerable work conditions" and nothing more. Growers-Br.23. As explained before, this is simply inaccurate. EEOC-Br.56-57. Insofar as a factfinder might conclude that the Growers either directly imposed these conditions or knew or should have known of them and failed to take remedial action within their control, the Growers may be held liable under Title VII for making the Claimants work harder for less pay, under worse conditions, than their non-Thai comparators.

Second, the Growers argue, the FAC fails to plead that the Claimants were similarly situated in all material respects to the non-Thai workers. Growers-Br.23-24. For example, they complain, the FAC "fails to allege that Claimants and non-Thai workers worked the same dates, at the same time of day, or during the same seasons." Growers-Br.24.[6] They also maintain the Claimants are not "similarly situated" because of the H-2A

---

[6] This argument seems particularly disingenuous given the sworn statements of Global's senior management that they hired Mexican and/or Hispanic H-2A workers contemporaneously to do the same work. *See infra* at 32; EEOC-Br.5; VIII-ER-2034, 2041.

program itself, which purportedly accounts for all differences in their pay, job assignments, and restricted movement. Growers-Br.2-3.

"[W]hether two employees are similarly situated is ordinarily a question of fact." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (internal citation and quotation marks omitted); *see also Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) ("similarly situated" is ordinarily not "a legal question to be resolved on a motion to dismiss"). "The employees' roles need not be identical; they must only be similar in all material respects. Materiality will depend on context and the facts of the case. Generally, we have determined that individuals are similarly situated when they have similar jobs and display similar conduct." *Hawn*, 615 F.3d at 1157 (internal citations and quotation marks omitted).

While the FAC does not use the words "similarly situated" (arguably itself a conclusory statement), a plain reading of its factual allegations supports an inference that the Claimants and their non-Thai comparators worked for the Growers contemporaneously. *See, e.g.*, XII-ER-2942 (par. 149: "The Mexican workers received priority over the Claimants when

work was slow and/or there was not enough work at Green Acre."; par.

150: "The Mexican workers were able to pick the larger apples first and

leave the smaller apples for the Claimants, which were harder to pick.";

par. 151 (describing specific Claimants' direct observations about different

treatment of Mexican workers)); XII-ER-2954 (par. 214: "Valley Fruit's

employees gave better assignments to the Mexican workers …."; par. 218:

"The Mexican workers could stop working when it was too hot outside but

the Thai workers could not stop working when it was 100 degrees."; par.

219: "…the Thai workers had to finish the work of the Mexican workers

when the Mexican workers did not complete it.").

As to the H-2A program, the Growers do not and cannot point to a

single allegation of orchard-based disparate treatment in this case that was

mandated by the program's terms. Even apart from more explicitly

abusive allegations, for example, neither the H-2A program nor the

Department of Labor requires American growers to compensate foreign

workers in any particular way (i.e., by the hour versus by the piece). *See*,

*e.g.*, 20 C.F.R. § 655.102(b)(6)(i)-(ii) (2004, 2005) (explaining H-2A program's

20

three-fourths guarantee for hourly and piece-rate workers). This argument is a red herring.

E. The Denial of Discovery Regarding Non-Orchard-Related Matters Was an Abuse of Discretion that Prejudiced EEOC.

The district court per se abused its discretion when it applied the wrong legal standard on joint employment in denying EEOC discovery on the Growers' involvement in non-orchard-related matters. EEOC-Br.57-58. The Growers offer no response to this point, instead continuing to argue the wrong legal standard themselves. Growers-Br.25, 30.

Incredibly, the Growers also argue that, simply because EEOC did not identify any additional materials or depositions it would have sought, EEOC did not show that the denial of discovery resulted in any prejudice. Growers-Br.30-31. This argument reflects a crabbed view of prejudice.

The district court denied all EEOC's requests for information regarding the Growers' involvement in obtaining H-2A visas or Labor Certifications, efforts to recruit non-H-2A workers, procedures relating to H-2A workers on the Growers' premises, or information about worker housing a Grower "owned, leased, rented, or otherwise controlled." I-ER-

21

148-55.  Then, when the court awarded attorney's fees, it did so largely

because it blamed EEOC for pursuing non-orchard-related aspects of this

case, which supposedly did not involve the Growers!  EEOC-Br.58-59; I-ER-

87-88.  Had EEOC been allowed discovery on these matters, it might have

obtained more information about the Growers' deeper involvement in non-

orchard-related aspects of the terms and conditions of the Claimants'

employment.  Given the later testimony that Valley Fruit owned and

managed at least one of the houses where the Claimants lived, *see supra* at

12 n.3, the prejudicial effect of the district court's ruling is unmistakable.

## II.  EEOC Adduced Sufficient Evidence that the Growers Were Liable for the Orchard-Based Hostile Work Environments to Survive Summary Judgment.

### A.  When EEOC Alleges a Pattern or Practice of Discrimination, It Is Only Required to Adduce Evidence of the Pattern or Practice.

The Growers assert, "[t]o establish its § 706 claim, the EEOC must

adduce evidence that each Claimant was individually discriminated

against."  Growers-Br.42 (citing *EEOC v. Swissport Fueling, Inc.*, 916 F. Supp.

2d 1005, 1020-21 (D. Ariz. 2013)); *see also id.* at 34-35.  While true as to

EEOC's individual claims, this is untrue as to EEOC's claim of a pattern or

22

practice of discrimination.  Although this Court has not expressly ruled on the availability of the *Teamsters* proof framework when EEOC sues under § 706, we note that, on remand after the Supreme Court's *General Telephone* decision, EEOC tried the case using the *Teamsters* method of proof, which this Court endorsed on appeal.  *See EEOC v. Gen. Tel. Co. of NW., Inc.*, 885 F.2d 575, 577, 584 (9th Cir. 1989) (§ 706 case).

Moreover, those Courts of Appeals that have addressed the issue have all ruled that EEOC may use the *Teamsters* pattern-or-practice framework under § 706.  *EEOC v. Bass Pro Outdoor World, LLC*, 826 F.3d 791, 800 (5th Cir. 2016), *reh'g en banc denied*, 2017 WL 1540853 (Apr. 28, 2017); *Serrano v. Cintas Corp.*, 699 F.3d 884, 896 (6th Cir. 2012); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 899 (7th Cir. 1999); *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1184, 1187-88 (4th Cir. 1981).  Nor does *Swissport* hold otherwise; it makes no mention of pattern-or-practice claims, merely stating that it follows other Arizona district courts in "analyz[ing] the EEOC's hostile work environment claims on a claimant-by-claimant basis." 916 F. Supp. 2d at 1021.

23

Accordingly, as the record evidence is sufficient to support a jury finding of a pattern or practice of discrimination by the Growers, *see infra* at 30-35, it is not appropriate to dismiss any Claimants at the liability stage. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (at liability stage, plaintiff must show "discrimination was the company's standard operating procedure[—]the regular rather than the unusual practice"); *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003) ("[P]attern-or-practice claims … must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace.") (citing *Teamsters*).

B.  There Was Sufficient Evidence to Support EEOC's Individual Claims.

EEOC's final disclosure list of August 2, 2013, contained a total of 102 Claimants who worked for one or both farms.  IX-ER-2091-94.  The Growers appear to argue summary judgment was warranted as to all 102 for one or more of the following reasons: as to thirty-four, EEOC purportedly "failed to provide anything more than work dates"; as to

others, EEOC either did not have a declaration for each[7] (Growers-Br.34, 42) or their declarations are "shams" (Growers-Br.43-45). Moreover, the Growers insist, the substantive evidence merely reflects Global's "unsavory" but not discriminatory conduct (Growers-Br.37), and no discriminatory conduct by the Growers (Growers-Br.40). The Growers are wrong.

      1. EEOC Was Not Required to Provide a Declaration for Each Claimant.

EEOC's obligation on summary judgment to adduce sufficient evidence that each Claimant was subjected to an actionable hostile work environment does not necessitate a separate declaration for each Claimant. As the district court observed in entering final judgment against Global, Global's treatment of the Claimants was "uniform[ly] … reprehensible." I-ER-7. While a few Claimants described separate incidents of egregious individual treatment, *e.g.*, IV-ER-872, for the most part they worked and

---

[7] Apparently sauce for the goose is not sauce for the gander, as the Growers demand that this Court dismiss the entire case based on smaller samples of unsworn interview notes (Growers-Br.19, 36) or a total of *five* Claimant depositions (Growers-Br.10-12). As explained before, these arguments have no merit. EEOC-Br.62-63.

moved in groups. Each declaration, accordingly, spoke not only of the individual declarant's treatment, but also about that of his Thai coworkers alongside him.

Thus, the question is not whether there was a record document for every Claimant, but whether the *totality* of the record—the thirty-eight declarations, plus the deposition excerpts, interview notes, work dates, and other evidence—permits a finding that each Claimant was subjected to a hostile work environment in the orchards. *Cf. Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000) ("it is the cumulative evidence to which a court ultimately looks" on summary judgment).

### 2. The Declarations Are Not "Shams."

The Growers baselessly accuse EEOC of crafting "sham" declarations. This Court has spoken in detail on what constitutes a "sham" declaration or affidavit—a body of law the Growers do not even address. As the Supreme Court noted in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999), the basic rule is that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by

contradicting his or her own *previous sworn statement* (by, say, filing a later affidavit that flatly contradicts that party's *earlier sworn deposition*) without explaining the contradiction or attempting to resolve the disparity." (Emphases added.)

Nonetheless, because "the sham affidavit rule is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence" and its "[a]ggressive invocation … threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys," it should be applied with caution. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (internal citations omitted). Thus, this Court has "fashioned two important limitations on a district court's discretion to invoke the sham affidavit rule." *Id.* First, the rule does not apply automatically every time an allegedly contradictory affidavit is introduced; rather, "the district court must make a factual determination that the contradiction was actually a sham." *Id.* (internal citation and quotation marks omitted). "Second, … the

27

inconsistency between a party's deposition testimony and subsequent

affidavit must be clear and unambiguous to justify striking the affidavit.

Thus, the non-moving party is not precluded from elaborating upon,

explaining or clarifying prior testimony …." *Id.* at 998-99 (internal citation

and quotation marks omitted).

The Claimants' declarations (III-ER-588–V-ER-1252) are not "shams"

for at least three reasons.  First, insofar as the Growers complain about

conflicts with prior interview notes, those unsworn notes are *not testimony*

*at all*.  *Cleveland*, 526 U.S. at 806; Fed. R. Evid. 603 ("Before testifying, a

witness must give an oath or affirmation to testify truthfully."); *Testimony*,

BLACK'S LAW DICTIONARY (10th ed. 2014) ("Evidence that a competent

witness under oath or affirmation gives at trial or in an affidavit or

deposition.").

Second, even a cursory review of the interview notes (II-ER-240-296,

340-446) reveals that they are mostly not comparable to the declarations.  A

few are similarly detailed, but many are sketchy or incomplete at best—

and understandably so—because they come from telephonic interviews,

conducted through teleinterpeters, where communication was often challenging. *See, e.g.*, II-ER-265 (noting teleinterpreter); II-ER-240, 252, 270, 274, 281, 294, 346, 377, 415 (telephone interview notes). This is exactly the kind of situation where, as the *Van Asdale* Court observed, a party would seek to elaborate on, clarify, or explain a witness's prior statements. 577 F.3d at 999. And this is also the function that the declarations, reviewed and signed in Thai by each declarant after professional translation, served in this case.

Third and finally, the purported "contradictions" the Growers identify are not even truly contradictory, much less "clearly" or "unambiguously" so. *See Van Asdale*, 577 F.3d at 998-99. Every "contradiction" identified at Growers-Br.43-44 is reconciled in EEOC counsel Li's declaration at II-ER-207-25. Thus, for example, at his interview Claimant Chumpang said Thais and Mexicans did the same general *type* of orchard-related work, but in his declaration he stated that Mexican workers were given easier *tasks*. II-ER-207. His statements, like the others, are not contradictory.

29

3. A reasonable jury could find the Growers, as joint employers, were liable for the hostile work environment in the orchards.

As explained previously, a reasonable jury could find the Growers liable both for their own part in the orchard-based hostility and for Global's part, of which they knew or should have known but did nothing. EEOC-Br.60-67. The Growers respond with a host of attempts to dismiss or bury competent and admissible evidence they would rather not acknowledge. Their arguments are meritless.

The Growers erroneously attempt to discount unfavorable evidence as "hearsay." Growers-Br.47-48. For example, Cuevas's testimony about Orian discussing with the Growers how he singled out Thai workers for their compliance (EEOC-Br.6) is not hearsay. As to Orian, EEOC offers it not for its truth—i.e., whether Thai workers really *were* more compliant than Hispanic workers—but for the Growers' notice of his beliefs and practices. The Growers' manifestations of acquiescence with Orian's views are not hearsay either. *See* Fed. R. Evid. 801(d)(2)(A) (statement by opposing party); *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991). Similarly, as explained previously, Narong Srinongkhot, who spoke

30

English, stated that he told Valley Fruit personnel directly about the

Claimants' mistreatment, which was offered not for its truth (i.e., the

mistreatment) but for Valley Fruit's notice. EEOC-Br.18. And regarding

the testimony cited at EEOC-Br.28-30, the bulk of the Claimants' statements

here are descriptions of eyewitness conduct, not speech, with the only

exception being Amattat's testimony at III-ER-592.

The Growers also mischaracterize the record and EEOC's arguments

about it. For example, the Growers accuse EEOC of distorting the record

regarding the Claimants' accounts of being told to work harder or faster

than their Mexican counterparts. Growers-Br.40 (citing EEOC-Br.64).

While EEOC included only a sample of this evidence in its opening brief

(noted below in **bold**), which the Growers ignore, the full list of references

to working "harder" or "faster" than the Mexicans is: III-ER-592, 593, 643,

679; IV-ER-742, 794, 812, 832-33, **872**, 891, **944**, 958-59; V-ER-993, 1008, 1027,

1084, 1085, 1099, 1150, 1244.

The Growers also continue to insist that EEOC made no showing

about the Mexican or Hispanic orchard workers being "similarly situated"

31

to the Claimants. They conveniently ignore the sworn statements of Global's supervisors, which EEOC adduced below, that they hired domestic workers contemporaneously with the Claimants to do the same work, and that they observed "many" of those domestic workers to be "Hispanic and/or of Mexican descent." *See* EEOC-Br.5; VIII-ER-2034, 2041. In combination with the statements of Claimants who recounted working and interacting with the Hispanic or Mexican workers in the fields, there was sufficient evidence to support such a finding. *See* EEOC-Br.28-30.

The critical point here is this: the uncontroverted record evidence reflects that the Growers' personnel, up to and including owners Morford and Verbrugge, were in their orchards on a regular, frequent, and in some cases daily basis, supervising and inspecting the Claimants' work. EEOC-Br.24-25. There was also extensive record evidence—from the mouths of Morford and Verbrugge themselves, as well as from Global management witnesses—that the Growers were extensively involved in daily management of the Claimants' crews' schedules, setting start and stop times and picking quotas. EEOC-Br.22-24.

32

As the masters of the Claimants' schedules and quotas, the Growers cannot claim ignorance of what the Thai crews were doing and how hard they were being made to work vis-à-vis other workers—indeed, they would have been *responsible* for those assignments. As some Claimants related, their quotas escalated beyond what was reasonable as time went on, and that decision also would have been entirely the Growers'. *See, e.g.*, III-ER-593, 643, 661, 677. According to the Claimants, these increased quotas from the Growers directly resulted in more threats and abuse from Global and/or the Growers themselves. *See, e.g.*, III-ER-593-94, 609, 611, 643, 677 ("Green Acre farm owner").

Given this record evidence, it strains all credulity for the Growers to assert that they had no knowledge of what the district court found to be Global's "uniform[ly] … reprehensible" conduct, I-ER-7—much less that that conduct was "merely unsavory." Growers-Br.37. The record would support a reasonable jury finding that the Growers, with their constant presence and involvement in the orchards, either knew or should have known about Global's mistreatment of the Claimants and took no

33

corrective action to stop it.  A reasonable jury could also find that Global and the Growers both participated in subjecting the Claimants to a hostile environment because of their national origin in working them increasingly harder, in tougher conditions and with fewer breaks, relative to non-Thai workers, based on a belief that they would be more compliant because they were Thai.  *See, e.g.*, *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1172 (10th Cir. 2007) ("[E]ven when an increase in assignments is not on its face discriminatory, if there exists other evidence of discriminatory conduct, a jury may reasonably infer that even seemingly non-discriminatory work assignments were in fact motivated by discriminatory animus."); *cf. EEOC v. NEA-Alaska*, 422 F.3d 840, 844 (9th Cir. 2004) (in Title VII sex harassment case, "[t]he ultimate question … is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (citing and quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)).

34

### III. The District Court Abused Its Discretion In Awarding the Growers Their Attorney's Fees.

    A. Substantive Judicial Review of EEOC's Investigation Is Both Impermissible and Unhelpful.

The *Christiansburg* standard for awarding attorney's fees to a prevailing defendant asks whether "the plaintiff's *action* was frivolous, unreasonable, or without foundation."  EEOC-Br.69-70 (emphasis added). *Christiansburg* and its progeny make clear that "action" refers to the full lifespan of claim(s) in litigation—not simply the initial decision to file a complaint.  *See, e.g.*, *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) ("Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation.  Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."); *Kohler v. Bed Bath & Beyond of Cal.*, 780 F.3d 1260, 1266-67 (9th Cir. 2015) (reiterating "action" standard and observing that *Christiansburg* admonition against post-hoc reasoning applies even in cases resolved at summary judgment) ; *EEOC v. Bruno's*

35

*Rest.*, 13 F.3d 285, 290 (9th Cir. 1993) (observing that "an 'airtight' claim is not a prerequisite to bringing suit").

As also explained previously, anything more than minimal judicial review of the EEOC's presuit process—comparable with the scope of review the Supreme Court afforded EEOC conciliations in *Mach Mining*—is legally impermissible and substantively unhelpful in the attorney's fees context. *See* EEOC-Br.72-75. The Growers' attempt to dismiss the cases EEOC cites (Growers-Br.58-59) as "inapposite" is both incomprehensible and, ultimately, unavailing. While most (not all) of these cases do not arise in the attorney's fees context, the principle remains the same: as the Second Circuit put it, "[t]he sole question for judicial review is whether the EEOC conducted an investigation." *EEOC v. Sterling Jewelers*, 801 F.3d 96, 101 (2d Cir. 2015). If the adequacy of EEOC's investigation is immaterial to whether the agency may bring suit in the first place, it is equally immaterial to whether it was frivolous for EEOC to litigate the case in retrospect.

36

More importantly, though, requiring federal courts to conduct burdensome mini-trials into the adequacy of EEOC investigations would do little to address the core question in *Christiansburg*: whether the *action* is frivolous, unreasonable, or without foundation. Courts know well how to make these assessments, measuring the adequacy of complaints against Federal Rules of Civil Procedure 8 and 12 and the governing legal standards; summary judgment against Rule 56 and the record evidence; and trial evidence against Rule 50. Indeed, as the *Christiansburg* Court itself recognized, 434 U.S. at 422, a case that appears weak or frivolous at the outset may look very different later, and discovery can reveal previously unavailable evidence—in fact, that is its very purpose. There is no reason for courts to second-guess agency investigations to determine whether litigation is frivolous.

B. This Action Is Not Frivolous, Unreasonable, or Without Foundation.

There is no basis for a finding that this action met the *Christiansburg* standard. Regrettably, the district court's legal analysis of EEOC's claims went awry early on, when it misapplied the *Torres-Lopez* joint employer

37

standard and dismissed all non-orchard-related aspects of EEOC's case against the Growers. *See* EEOC-Br.50-52, 76. Then, in addressing the orchard-related hostile work environment claims, the court applied another incorrect joint employer standard based on the *Darden* independent contractor test. *See supra* at 7-8; I-ER-99. While finding that EEOC *met* this standard, the court nonetheless concluded that EEOC failed to adduce sufficient evidence that the Growers participated in, or knew or should have known of, what was right before their eyes. *See supra* at 32-34; EEOC-Br.15-19, 26-30. At a minimum, given the district court's considerable confusion, it cannot be said that the governing law was so clear that this action did not help to clarify it. *See Kohler*, 780 F.3d at 1267 ("Kohler's claims … were not clearly resolved by our prior caselaw .… The law grows with clarity for benefit of the public through such actions even if they are not successful.").

The district court then awarded the Growers their attorney's fees for two principal, patently erroneous reasons: EEOC's joint employer theory was frivolous, and its administrative investigation was somehow

38

inadequate. In both respects, the court erred as a matter of law and abused

its discretion. *See* EEOC-Br.46, 76.

<u>CONCLUSION</u>

For the foregoing reasons and those in EEOC's opening brief, the

district court's judgment should be reversed and the case remanded for

further proceedings.

Respectfully submitted,

JAMES L. LEE
Deputy General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

LORRAINE C. DAVIS
Assistant General Counsel

<u>s/Elizabeth E. Theran</u>
ELIZABETH E. THERAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4720
elizabeth.theran@eeoc.gov

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Ninth Cir. R.

32-1(b) because it contains 6,990 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f) and Ninth Cir. R. 32-1(c).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

it has been prepared in a proportionally spaced typeface using Microsoft

Word 2016 in Palatino Linotype 14 point.

<u>s/Elizabeth E. Theran</u>
ELIZABETH E. THERAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4720
elizabeth.theran@eeoc.gov

Dated: May 10, 2017

## CERTIFICATE OF SERVICE

I, Elizabeth E. Theran, hereby certify that I electronically filed the foregoing brief with the Court via the appellate CM/ECF system this 10th day of May, 2017.  I also certify that all counsel of record have consented to electronic service and will be served the foregoing brief via the appellate CM/ECF system.

s/Elizabeth E. Theran
ELIZABETH E. THERAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4720
elizabeth.theran@eeoc.gov

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-35528

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is [＿＿＿] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [6.990] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [＿＿＿] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [＿＿＿]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [＿＿＿] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [＿＿＿] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [＿＿＿] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [＿＿＿] words or [＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant    [s/Elizabeth E. Theran]    Date [May 10, 2017]

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*