**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Plaintiff-Appellant*, <br><br> v. <br><br> GLOBAL HORIZONS, INC., DBA Global Horizons Manpower, Inc.; GREEN ACRE FARMS, INC.; VALLEY FRUIT ORCHARDS, LLC; DOES, 1–10 Inclusive, <br><br> *Defendants-Appellees.* | No. 16-35528 <br><br> D.C. No. 2:11-cv-03045-EFS <br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, Senior District Judge, Presiding

Argued and Submitted June 13, 2018
Seattle, Washington

Filed February 6, 2019

Before:  Ronald M. Gould and Paul J. Watford, Circuit
Judges, and Barbara Jacobs Rothstein,[*] District Judge.

Opinion by Judge Watford

---

[*] The Honorable Barbara Jacobs Rothstein, United States District
Judge for the Western District of Washington, sitting by designation.

# SUMMARY[**]

## Equal Employment Opportunity Commission

The panel reversed the district court's orders in an enforcement action brought by the Equal Employment Opportunity Commission ("EEOC") under Title VII of the Civil Rights Act of 1964 on behalf of Thai workers alleging discrimination charges against Green Acre Farms and Valley Fruit Orchards (the "Growers").

The Growers retained Global Horizons, Inc., a labor contractor, to obtain temporary workers for their orchards. Global Horizons recruited workers from Thailand and brought them to the United States under the H-2A guest worker program. The district court entered a default judgment against Global Horizons after it discontinued its defense in the action; this case focuses solely on the liability of the Growers.

The district court granted in part the Growers' Fed. R. Civ. P. 12(b)(6) motions to dismiss. The district court drew a distinction between orchard-related matters (managing, supervising, and disciplining the Thai workers at the orchards) and non-orchard-related matters (housing, feeding, transporting, and paying the workers).

The panel held that the district court erred in holding that the Growers could not be held liable under Title VII for non-orchard-related matters.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Deciding in the first instance what test to employ for determining whether an entity is a joint employer under Title VII, the panel held that the common-law agency test should be applied. Under the common-law test, the principle guidepost is the element of control. The panel rejected the chief alternative for analyzing employment relationships in the Title VII context: the economic-reality test. The panel held that the district court correctly determined that the EEOC's allegations were sufficient to establish that the Growers and Global Horizons were joint employers as to orchard-related matters. Applying the common-law agency test, the panel concluded that the EEOC adequately alleged that the Growers' employment relationship with the Thai workers also subsumed non-orchard-related matters.

The panel held that the EEOC plausibly alleged Green Acre's liability as a joint employer for the discriminatory conduct of Global Horizons. The panel further held that the EEOC plausibly alleged Green Acre's liability under Title VII for discrimination relating to non-orchard-related matters. The panel also held that the EEOC's allegations were thinner as they related to the liability of Valley Fruit. The panel reversed the district court's dismissal of the EEOC's allegations against Valley Fruit with respect to non-orchard-related matters; and directed on remand that the EEOC be permitted to amend its complaint as to Valley Fruit's liability for non-orchard-related matters. The panel further directed that the district court should then reconsider the disparate treatment claim (and the related pattern-or-practice claim) in light of the EEOC's allegations regarding both orchard-related and non-orchard-related matters.

The panel reversed the district court's order denying the EEOC's motions to compel discovery regarding the Growers' liability with respect to non-orchard-related

matters. The panel also reversed the district court's order granting the Growers' motion for summary judgment. Finally, the panel reversed the district court's order granting the Growers' motions for attorneys' fees because the Growers were no longer prevailing parties.

## COUNSEL

Gail S. Coleman (argued), Elizabeth E. Theran, and Jeremy D. Horowitz, Attorneys; Lorraine C. Davis, Assistant General Counsel; Jennifer S. Goldstein, Associate General Counsel; James L. Lee, Deputy General Counsel; Equal Employment Opportunity Commission, Office of General Counsel, Washington, D.C.; for Plaintiff-Appellant.

Justo G. Gonzalez (argued), Lance A. Pelletier, and Brendan V. Monahan, Stokes Lawrence, P.S., Seattle, Washington, for Defendants-Appellees.

## OPINION

WATFORD, Circuit Judge:

Green Acre Farms and Valley Fruit Orchards (the Growers) are fruit growers in the State of Washington. In 2003, the Growers experienced labor shortages and entered into agreements with Global Horizons, Inc., a labor contractor, to obtain temporary workers for their orchards. With the Growers' approval, Global Horizons recruited workers from Thailand and brought them to the United States under the H-2A guest worker program, which allows agricultural employers to hire foreign workers for temporary and seasonal work.

In 2006, two of the Thai workers filed discrimination charges against the Growers and Global Horizons with the Equal Employment Opportunity Commission (EEOC). After an investigation, the EEOC brought this action under Title VII of the Civil Rights Act of 1964. The EEOC alleged, among other things, that the Growers and Global Horizons subjected the Thai workers to poor working conditions, substandard living conditions, and unsafe transportation on the basis of their race and national origin. The district court entered a default judgment against Global Horizons after it discontinued its defense in the action; Global Horizons was financially insolvent by the time the EEOC brought suit. This case thus focuses solely on the liability of the Growers.

Title VII imposes liability for discrimination on "employer[s]." 42 U.S.C. § 2000e-2(a). The threshold question raised in this appeal is whether the Growers and Global Horizons were joint employers of the Thai workers for Title VII purposes.

At the motion to dismiss stage, the district court divided the EEOC's allegations into those involving "orchard-related matters" (referring to working conditions at the orchards) and those involving "non-orchard-related matters" (referring to housing, meals, transportation, and payment of wages). The district court then held that the EEOC had plausibly alleged the Growers were joint employers of the Thai workers as to orchard-related matters, but not as to non-orchard-related matters. The court accordingly dismissed all allegations against the Growers relating to non-orchard-related matters.

Following that decision, the district court (1) granted in part the Growers' motions to dismiss; (2) denied in part the EEOC's motions to compel discovery; (3) granted the

Growers' motion for summary judgment; and (4) granted the Growers' motions for attorney's fees on the ground that the EEOC's claims were frivolous and without foundation from the outset. The EEOC challenges each of these orders on appeal.

We reverse the district court's dismissal of the EEOC's allegations regarding non-orchard-related matters, which in turn affects each of the other decisions under review. All parties agree that the Growers and Global Horizons were joint employers of the Thai workers with respect to orchard-related matters. Thus, the salient question before us is whether the EEOC plausibly alleged that the Growers were also joint employers with respect to non-orchard-related matters. We conclude that the EEOC has so alleged. We also conclude that the EEOC's allegations state a plausible basis for holding Green Acre liable for discrimination relating to non-orchard-related matters, and that the district court should have granted the EEOC leave to amend its complaint regarding Valley Fruit's liability with respect to such matters. Those conclusions require us to reverse each of the four rulings the EEOC challenges.

I

In 2003, Green Acre and Valley Fruit began to experience labor shortages and contracted with Global Horizons to obtain temporary workers for their orchards. Each Grower separately entered into labor agreements with Global Horizons covering the periods February–November 2004 and January–November 2005. Pursuant to the contracts, Global Horizons agreed to recruit foreign workers for the Growers through the H-2A guest worker program.

The H-2A program, which is administered by the Department of Labor, allows employers to hire foreign

workers for agricultural labor on a temporary or seasonal basis. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Congress designed the program to "balance two competing interests: to assure employers an adequate labor force on the one hand and to protect the jobs of citizens on the other." *Orengo Caraballo v. Reich*, 11 F.3d 186, 190 (D.C. Cir. 1993) (alteration and internal quotation marks omitted).

The H-2A program imposes a number of requirements on employers reflecting these competing interests. For example, in order to participate in the program, an employer must first obtain a labor certification from the Secretary of Labor by showing:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). In its certification application, the employer must specify the number of foreign workers that it needs to offset the shortage of American agricultural workers. 20 C.F.R. § 655.101(b)(1) (2004).[1] The employer

---

[1] Throughout this opinion, we refer to the version of the Department of Labor's regulations in effect in 2004 and 2005, when the Growers contracted with Global Horizons to hire Thai workers through the H-2A program. The regulations have been amended and renumbered several times since then.

must also include a copy of its job offer in the application. *Id.* The purpose of requiring the job offer is to ensure that the employer is offering sufficient pay and benefits to H-2A guest workers so that the employment of foreign workers does not adversely affect domestic workers. § 655.102(b).

An employer is required to provide H-2A workers with certain non-wage benefits as part of the job offer, most notably housing, meals, and transportation. The Department of Labor's regulations spell out in some detail the nature of these benefits. For instance, the employer must provide H-2A workers with housing and transportation to and from the worksite, free of charge. § 655.102(b)(1), (b)(5)(iii). The employer must also ensure that the workers' housing and transportation satisfy all applicable health and safety regulations. *Id.* In addition, the regulations require the employer to provide H-2A workers with three meals a day at nominal cost or access to free cooking facilities that the workers can use to prepare their own meals. § 655.102(b)(4). Furthermore, the regulations require the employer to pay H-2A workers at least twice per month at a specific wage rate set by the Department of Labor. § 655.102(b)(9)–(10).

Under their labor contracts, the Growers and Global Horizons agreed to share responsibility for managing the Thai workers and for fulfilling the various H-2A requirements. At the orchards, the Growers agreed to provide general management and oversight, which included determining the number of workers needed for each task, setting quotas for work output, and inspecting the quality of the work. Global Horizons likewise agreed to provide day-to-day supervision over the workers. As to the H-2A requirements, Global Horizons agreed to provide the Thai workers with housing and transportation and to pay them the

appropriate wages. The contracts were silent as to which party bore responsibility for providing the workers with meals or access to cooking facilities, but Global Horizons agreed to provide the workers with any legally required "ancillary support, equipment, supplies, transportation and facilities," which encompassed meals or cooking facilities. In exchange, the Growers agreed to compensate Global Horizons for the Thai workers' wages and benefits and to pay Global Horizons an additional fee for its services.

According to the allegations in the EEOC's complaint, the Growers and Global Horizons engaged in a discriminatory and exploitative scheme to recruit the H-2A workers. They allegedly targeted impoverished Thai nationals to work at the orchards in the belief that such workers would be more compliant and less likely to abscond than workers of other nationalities. Global Horizons sent recruiters to Thailand to lure potential workers with false promises of high wages and steady employment. Global Horizons also charged the workers exorbitant recruitment fees for the opportunity to work in the United States. To pay the fees, many of the Thai workers were forced to mortgage their homes and land, sometimes along with the homes and land of their relatives, and to incur other substantial debts.

With respect to orchard-related matters, the Growers and Global Horizons allegedly subjected the Thai workers to poor working conditions at the orchards. The Thai workers were mostly assigned to pick fruit and trim trees, and the Growers set strict quotas for the amount of fruit to be picked. According to the EEOC, supervisors pressured the Thai workers to meet the quotas by verbally harassing them, calling them degrading names, and threatening them with pay cuts, termination, and deportation. Moreover, Global Horizons did not provide the Thai workers with the high

wages or steady employment that it had promised. Global Horizons often delayed paying the workers or paid them too little, and there were weeks during which the workers had no work at all. The Growers and Global Horizons allegedly discriminated against the Thai workers and treated them differently from the Mexican workers who also worked at the orchards. According to the EEOC, the Growers and Global Horizons assigned the Thai workers more demanding work, gave them fewer breaks, forced them to work in extreme heat and in the rain, and gave priority to Mexican workers when there was a shortage of work.

With respect to non-orchard-related matters, Global Horizons allegedly subjected the Thai workers to discriminatory treatment. According to the EEOC's complaint, Global Horizons provided the workers with overcrowded and nearly uninhabitable housing. The housing lacked adequate kitchen, bathroom, and laundry facilities, and sometimes lacked even running water or electricity. Some units were infested with mice, flies, and cockroaches. These conditions forced the Thai workers to take desperate measures. Some urinated and defecated outside because there were not enough bathrooms. Some slept on the floor because there were not enough beds. Others dug through the trash to look for beds, mattresses, and kitchen equipment. Rather than provide meals for the workers, Global Horizons chose to provide them with access to cooking facilities, at which the workers were expected to prepare their own meals. But the Thai workers often did not have enough to eat because the kitchen facilities and equipment were inadequate, and Global Horizons' employees did not take the workers to the grocery store frequently enough. As a consequence, some workers resorted to hunting rabbits or birds for food. Global Horizons also exposed the workers to unsafe conditions

when transporting them between their housing and the orchards. The buses were so crowded that some of the workers had to sit in the middle aisle of the bus, on water coolers, or on each other's laps. According to the EEOC, the Growers and Global Horizons did not subject Mexican workers to similarly appalling conditions.

Global Horizons allegedly took various measures to ensure that the Thai workers did not escape from (or complain about) their dire circumstances. Global Horizons exercised control over the workers in part by taking advantage of their crippling debts. Many of the workers had borrowed heavily to pay Global Horizons' recruitment fees, and their only opportunity to pay off those debts was to work in the United States. Exploiting that vulnerability, Global Horizons threatened to send the workers back to Thailand if they ever complained about their poor working and living conditions. As added pressure, Global Horizons confiscated the workers' passports and employed guards to monitor the workers so that they could not physically escape from the orchards.

In 2006, two of the Thai workers filed charges of discrimination with the EEOC. They claimed that the Growers and Global Horizons engaged in ongoing discrimination, harassment, and retaliation on the basis of national origin. The EEOC conducted an investigation from 2006 to 2010 and found reasonable cause to believe that the charges were true. After unsuccessful conciliation efforts, the EEOC filed the present action on behalf of the Thai workers. In the operative First Amended Complaint, the EEOC asserts four claims for relief under Title VII of the Civil Rights Act of 1964: (1) disparate treatment based on race or national origin; (2) hostile work environment and constructive discharge; (3) retaliation; and (4) related

pattern-or-practice claims.  42 U.S.C. §§ 2000e-2(a), 2000e-3(a).

The district court granted in part the Growers' motions to dismiss the action under Federal Rule of Civil Procedure 12(b)(6).  In the district court's view, the EEOC had not plausibly alleged that the Growers were joint employers of the Thai workers as to all employment matters.  The court drew a distinction between orchard-related matters (managing, supervising, and disciplining the Thai workers at the orchards) and non-orchard-related matters (housing, feeding, transporting, and paying the workers).  The court concluded that the Growers had outsourced the non-orchard-related matters to Global Horizons, and that the Growers' employment relationship with the Thai workers therefore extended only to orchard-related matters.  Based on that conclusion, the court dismissed all allegations against the Growers relating to non-orchard-related matters.  The court then decided that the remaining allegations were insufficient to sustain the disparate treatment claim, the retaliation claim against Valley Fruit, and the related pattern-or-practice claims.  Later, in accordance with its earlier rulings, the court denied the EEOC's motions to compel discovery to the extent that those motions sought information related to non-orchard-related matters.

After discovery concluded, the district court granted summary judgment in favor of the Growers on the EEOC's remaining Title VII claims: the hostile work environment and constructive discharge claim, the retaliation claim against Green Acre, and related pattern-or-practice claims. Having barred discovery for non-orchard-related matters, the court reviewed the claims only in light of evidence regarding orchard-related matters.  Based on that limited review, the court concluded that no reasonable trier of fact

could find that the Growers had discriminated against the Thai workers in violation of Title VII.

The district court then granted the Growers' motions for attorney's fees. The court held that the EEOC had not conducted an adequate investigation before filing suit and had pursued frivolous claims and remedies as a result. In particular, the court faulted the EEOC for predicating its claims on the theory that the Growers could be held liable as joint employers as to non-orchard-related matters.

After entry of final judgment, the EEOC filed this timely appeal.

## II

Our analysis begins and largely ends with the district court's holding that the Growers could not be held liable under Title VII for non-orchard-related matters. That holding, which we conclude below was erroneous, provided the foundation for each of the orders the EEOC challenges on appeal.

## A

Under Title VII, an entity can be held liable for discrimination if it is an "employer" of the plaintiff. 42 U.S.C. § 2000e-2(a). It is now well-settled that an individual can have more than one employer for Title VII purposes. *See, e.g.*, *Frey v. Hotel Coleman*, 903 F.3d 671, 676–77 (7th Cir. 2018); *Al-Saffy v. Vilsack*, 827 F.3d 85, 96 (D.C. Cir. 2016); *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015); *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 408–10 (4th Cir. 2015). The law recognizes that two entities may simultaneously share control over the terms and conditions

of employment, such that both should be liable for discrimination relating to those terms and conditions.  *See Butler*, 793 F.3d at 408–10.  The two entities in such circumstances are deemed to be joint employers of the employees in question.

Our court has not yet adopted a test for determining when an entity may be held liable as a joint employer under Title VII.  The EEOC correctly points out that we addressed this issue once before in *EEOC v. Pacific Maritime Association*, 351 F.3d 1270 (9th Cir. 2003), but the panel opinion in that case was vacated upon the grant of rehearing en banc. 367 F.3d 1167 (9th Cir. 2004).  The parties voluntarily dismissed the case before rehearing occurred, so our court never issued an opinion sitting en banc.

We are therefore required to decide in the first instance what test to adopt for determining whether an entity is a joint employer.  Title VII itself does not shed much light on the answer.  Under the statute, the term "employer" is defined (subject to exclusions not relevant here) as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b).  The term "employee" is defined (again subject to exclusions not relevant here) as "an individual employed by an employer."  § 2000e(f).

The Supreme Court has held that, when confronted with "completely circular" definitions like these, courts should use common-law agency principles to analyze the existence of an employer-employee relationship.  *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992).  As the Court has noted, a lack of congressional guidance "often reflects an expectation that courts will look to the common law to fill gaps in statutory text, particularly when an undefined term has a settled meaning at common law."

*Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 447 (2003). The Court has relied on common-law agency principles to flesh out the meaning of "employer" and "employee" when construing other statutes that contain the same circular definitions as those found in Title VII. *See id.* at 444–45 (Americans with Disabilities Act); *Darden*, 503 U.S. at 322–23 (Employee Retirement Income Security Act). We conclude that the common-law agency test should be applied in the Title VII context as well.

Under the common-law test, "the principal guidepost" is the element of control—that is, "the extent of control that one may exercise over the details of the work of the other." *Clackamas*, 538 U.S. at 448 (internal quotation marks omitted). The Court has provided a non-exhaustive list of factors to consider when analyzing whether the requisite control exists:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24 (internal quotation marks omitted). There is "no shorthand formula" for determining whether an employment relationship exists, so "all of the

incidents of the relationship must be assessed and weighed with no one factor being decisive." *Id.* at 324 (internal quotation marks omitted).

We reject the chief alternative for analyzing employment relationships in the Title VII context: the economic-reality test. That test focuses on whether workers are economically dependent on the alleged joint employer. *Torres-Lopez v. May*, 111 F.3d 633, 641 (9th Cir. 1997). Like the common-law agency test, the economic-reality test provides a non-exhaustive list of factors courts should consider. *Id.* at 639–40. However, the economic-reality test was developed in the context of the Fair Labor Standards Act (FLSA) and the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), two statutes that differ from Title VII in material respects. Unlike Title VII, both the FLSA and the AWPA provide broad definitions of "employ" that expand the scope of employment relationships beyond the common-law understanding. 29 U.S.C. §§ 203(g), 1802(5); *see also Darden*, 503 U.S. at 326. In addition, the Department of Labor has promulgated regulations under the FLSA and the AWPA to guide the analysis for joint employment. *See* 29 C.F.R. §§ 500.20(h)(5), 791.2. The economic-reality test is based on the broad statutory definitions found in the FLSA and the AWPA and the regulatory guidance described above. *See Torres-Lopez*, 111 F.3d at 639–40; *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983). Because those features are not present in the Title VII scheme, we see no basis for supplanting the common-law test with the economic-reality test.

We acknowledge that there may be little functional difference among the common-law agency test, the economic-reality test, and a third test that blends elements of

the first two (the so-called "hybrid" test). *See Murray v. Principal Financial Group, Inc.*, 613 F.3d 943, 945 (9th Cir. 2010). All three are fact-intensive tests that will usually produce the same outcome in a joint-employment analysis. But Supreme Court precedent dictates that the common-law test governs when a statute does not meaningfully define terms like "employer" and "employee." *See Clackamas*, 538 U.S. at 444–45; *Darden*, 503 U.S. at 322–23. Thus, we conclude that the common-law agency test is the most appropriate one for Title VII purposes.

B

The district court correctly determined that the EEOC's allegations are sufficient to establish that the Growers and Global Horizons were joint employers as to orchard-related matters. The Growers do not contest that determination on appeal. The only issue is whether the EEOC plausibly alleged that the Growers' employment relationship with the Thai workers also subsumed non-orchard-related matters. Applying the common-law agency test, we conclude that the EEOC adequately alleged that element of its claims.

In a typical employment relationship, the employer does not have control over non-workplace matters such as housing, meals, and transportation. Employees are usually expected to find their own housing, provide for their own meals, and arrange for their own transportation to and from work. Those matters ordinarily do not constitute terms and conditions of employment, so if an employee experiences discrimination in obtaining adequate housing, for example, the employer would not be liable for failing to stop that discrimination.

The H-2A program establishes a different relationship between an employer and the foreign guest workers it

employs.  As explained above, the H-2A regulations place on the shoulders of an "employer" (a defined term to which we will return in a moment) the legal obligation to provide foreign guest workers with housing, transportation, and either low-priced meals or access to cooking facilities. 20 C.F.R.  § 655.102(b)(1),  (4),  (5)(iii).    Under  the regulations, these benefits constitute "material terms and conditions of employment," which must be stated in the job offer provided to all potential H-2A workers.  § 655.100(b). The  H-2A  program  thus  expands  the  employment relationship between an H-2A "employer" and its workers to encompass housing, meals, and transportation, even though those matters would ordinarily fall outside the realm of the employer's responsibility.

The Growers contend that they were not "employers" of the Thai workers with respect to non-orchard-related matters.   In their view, only Global Horizons was the employer because it was the entity that recruited the workers from Thailand, brought them to the United States, and contractually agreed to be responsible for paying their wages and providing the benefits required under the H-2A program.

The plain language of the H-2A regulations, at least as they stood in 2004–2005, compels us to reject the Growers' argument.  The regulations during that time period defined the term "employer" as an entity "which suffers or permits a person to work and (1) which has a location within the United States to which U.S. workers may be referred for employment, and which proposes to employ workers at a place within the United States and (2) which has an employer relationship with respect to employees under this subpart as indicated by the fact that it may hire, pay, fire, supervise or otherwise  control  the  work  of  any  such  employee." § 655.100(b).     The  regulations  also  state  that  the

"employers" who may utilize the H-2A program normally share certain characteristics, first among them "[a] fixed-site farm, ranch, or similar establishment." § 655.93(a)(1).

Under these provisions, the Growers qualify as "employers." The Growers each own a fixed-site farm, and they meet both prongs of the regulatory definition of "employer." Each has a location in the United States at which it proposed to employ foreign guest workers, and neither Grower disputes that it had an employment relationship with those workers by virtue of its ability to "supervise or otherwise control the work" of the Thai workers. The Growers' status as "employers" of the Thai workers is further confirmed by the fact that, at the time relevant here, foreign guest workers admitted under the H-2A program could work only at the farm or other fixed-site location designated in the certification order issued by the Department of Labor. § 655.106(c)(1). The regulations sensibly placed the obligation for providing housing, meals, transportation, and wages on the owner of the farm designated in the certification order, since the foreign workers were admitted to the United States on a temporary basis solely to render services for the owner's benefit.

The terms of the contracts between the Growers and Global Horizons do not change this analysis. The contracts, it is true, delegated to Global Horizons responsibility for providing housing, access to cooking facilities, transportation, and wages for the Thai workers. But that contractual delegation did not absolve the Growers of their legal obligations as "employers" under the H-2A regulations. Those obligations were imposed on the Growers as a matter of law. The Growers were free to contract with another entity to help discharge their legal

obligations, but responsibility for compliance ultimately rested on the Growers' shoulders.

With this regulatory backdrop in mind, we must determine whether the EEOC has plausibly alleged that the Growers were joint employers under Title VII as to non-orchard-related matters. Most of the factors we would typically consider in applying the common-law agency test, *see Darden*, 503 U.S. at 323–24, do not apply here because we are not dealing with matters ordinarily encompassed within an employment relationship. But the common law's "principal guidepost"—the element of control—is determinative. *Clackamas*, 538 U.S. at 448. As just discussed, pursuant to the 2004–2005 H-2A regulations, the Growers were legally obligated to provide the Thai workers with housing, meals, transportation, and wages. The Growers possessed ultimate authority over those matters, even though they delegated responsibility to Global Horizons and agreed to compensate Global Horizons for its services. If the Growers were dissatisfied with the quality of Global Horizons' services, they could have demanded changes, withheld payment, or ended the contract with Global Horizons altogether. The power to control the manner in which housing, meals, transportation, and wages were provided to the Thai workers, even if never exercised, is sufficient to render the Growers joint employers as to non-orchard-related matters. *See Browning-Ferris Industries of California, Inc. v. NLRB*, __ F.3d __, 2018 WL 6816542, at *10–11 (D.C. Cir. Dec. 28, 2018).

## C

Although the EEOC has plausibly alleged that the Growers were joint employers as to non-orchard-related matters, that does not end our analysis. The EEOC alleged that Global Horizons, rather than the Growers, was the entity

directly responsible for engaging in discriminatory conduct as to non-orchard-related matters.

As our sister circuits have explained, even if a joint-employment relationship exists, one joint employer is not automatically liable for the actions of the other. *See, e.g.*, *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228–29 (5th Cir. 2015); *Whitaker v. Milwaukee County*, 772 F.3d 802, 811–12 (7th Cir. 2014). Liability may be imposed for a co-employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and "failed to undertake prompt corrective measures within its control." EEOC, Notice No. 915.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, 1997 WL 33159161, at *11 (Dec. 3, 1997). We have employed that same negligence standard in an analogous setting, involving an employer's liability for the discriminatory conduct of third parties in the workplace. *See, e.g.*, *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (subjecting Department of Corrections to liability for prisoners' sexual harassment of female guards); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002) (subjecting employer to liability for client's rape of employee). We agree with the Fifth and Seventh Circuits that this standard should govern in the joint-employment context as well. *See Burton*, 798 F.3d at 228–29; *Whitaker*, 772 F.3d at 811–12.

The EEOC has plausibly alleged Green Acre's liability as a joint employer for the discriminatory conduct of Global Horizons. In its complaint, the EEOC alleged that some of the Thai workers complained directly to Green Acre personnel, including its co-owner, about their abysmal living conditions, unsafe transportation, and missing or late wages.

According to the EEOC, the Thai workers told Green Acre's employees that similarly situated Mexican workers were not subject to the same substandard conditions. These allegations give rise to the plausible inference that Green Acre knew or should have known about Global Horizons' discriminatory conduct relating to non-orchard-related matters. As explained above, the EEOC's allegations establish that Green Acre had ultimate control over those matters and thus could have taken corrective action to stop the discrimination. According to the EEOC's complaint, Green Acre failed to take any such action. Accordingly, the EEOC has plausibly alleged Green Acre's liability under Title VII for discrimination relating to non-orchard-related matters.

The EEOC's allegations are thinner as they relate to the liability of Valley Fruit. As with Green Acre, the EEOC plausibly alleged that Valley Fruit had ultimate control over non-orchard-related matters and failed to take appropriate corrective action to stop Global Horizons' discriminatory conduct. But the complaint does not adequately allege that Valley Fruit knew or should have known about that conduct, a necessary condition to trigger its obligation to take prompt corrective action. The complaint alleges only that state and federal authorities were investigating Global Horizons for providing substandard housing and inadequate wages during the time period in question here. The complaint does not allege that Valley Fruit ever became aware of these investigations, nor provide a plausible basis for inferring that knowledge of the investigations would have alerted Valley Fruit to the fact that Global Horizons was allegedly discriminating against the Thai workers on the basis of race or national origin.

Nevertheless, we cannot affirm the district court's dismissal of the EEOC's allegations against Valley Fruit with respect to non-orchard-related matters. The district court did not predicate dismissal of those allegations on the ground that they failed to raise a plausible inference that Valley Fruit knew or should have known about Global Horizons' discriminatory conduct. It instead dismissed those allegations on the ground that Valley Fruit could not be found liable as a matter of law for non-orchard-related matters. We have now reversed that ruling, and on remand the EEOC should be permitted an opportunity to amend its complaint with respect to Valley Fruit's liability as to non-orchard-related matters. From the record before us, it does not appear as though amendment in that regard would be futile. The record contains declarations from several Thai workers stating that Valley Fruit personnel provided or directly observed the workers' substandard living conditions, unsafe transportation, and inadequate wages. These declarations suggest that, as with Green Acre, Valley Fruit knew or should have known that the Thai workers were being treated less favorably than the Mexican workers.

III

In light of the discussion above, we reverse each of the orders challenged on appeal. First, we reverse the district court's order granting in part the Growers' motions to dismiss. The court erred by dismissing the EEOC's disparate treatment claim (and the related pattern-or-practice claim) on the ground that the Growers were not joint employers of the Thai workers as to non-orchard-related matters. (The EEOC does not challenge the dismissal of its retaliation claim or the related pattern-or-practice claim.) On remand, the district court is instructed to grant the EEOC leave to amend its complaint with respect to Valley Fruit's

liability as to non-orchard-related matters. The court should then reconsider the disparate treatment claim (and the related pattern-or-practice claim) in light of the EEOC's allegations regarding both orchard-related and non-orchard-related matters.

Second, we reverse the district court's order denying the EEOC's motions to compel discovery regarding the Growers' liability with respect to non-orchard-related matters. The court's order was predicated on the incorrect premise that the Growers could not be held liable for non-orchard-related matters as a matter of law.

Third, we reverse the district court's order granting the Growers' motion for summary judgment. At that stage, the court reviewed the EEOC's remaining Title VII claims only in light of the evidence regarding orchard-related matters, after having cut off discovery for all non-orchard-related matters. On remand, following appropriate discovery, the court is instructed to reconsider the EEOC's claims in light of evidence regarding both orchard-related and non-orchard-related matters.

Finally, we reverse the district court's order granting the Growers' motions for attorney's fees, as the Growers are no longer prevailing parties. *See* 42 U.S.C. § 2000e-5(k). Moreover, the EEOC's litigation position was not frivolous, unreasonable, or without foundation. *See Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).

**REVERSED and REMANDED WITH INSTRUCTIONS.**

The Growers' motion to supplement the record on appeal, filed April 4, 2017, is **DENIED.**